**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**JOHN REGUL,**

      **Plaintiff,**

**vs.**                             **Case No. 4:09cv19-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/

**REPORT AND RECOMMENDATION**

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. LOC. R. 72.2(D). It is recommended that the decision of the Commissioner be reversed and remanded for further proceedings.

**Procedural status of the case**

Plaintiff, John Regul, applied for disability insurance benefits. His last date of insured status for disability benefits was December 31, 2004, and he must prove onset of disability on or before that date.

Plaintiff alleges disability due to post traumatic stress disorder (PTSD) and depression related to his combat experiences in Vietnam in 1967, but with onset on July 22, 1999. Plaintiff was born on July 10, 1947, was 60 years old at the time of the administrative hearing (on November 6, 2007), and has a 12th grade education. R. 78, 89.

Plaintiff has past relevant work as a public works designer. R. 85. He stated in a form that he designed water, sewer, and storm drainage systems for cities. *Id.* He performed this work from 1977 through 1999. *Id.* Plaintiff said that he did not supervise other people in this job, was not a lead worker, but he used machines, tools, and equipment. Id. He said that he used technical knowledge and skills and wrote reports. *Id.* He sat for 6 hours a day and stood for 2 hours a day. *Id.* The job did not require any lifting. *Id.* In another form completed by Plaintiff, however, Plaintiff said that his job as a public works designer did not require that he write reports or perform like duties. R. 107. In the remarks section of the second form he said:

> Working at the City of [Dunnedin in the job of public works designer] the first 10 [years] was great but as I was being advanced in my career I began [to] have problems dealing with the public and the politics of government. There were times I spoke up about doing things for select groups and not the public in general. This would cause difficulties with supervision and chances of future advancement in my career which just made me hate authority that much more.

R. 110-111.

The Administrative Law Judge found at step 2 that Plaintiff has the following severe impairments: polysubstance abuse, depressive disorder, and anxiety reaction secondary to post traumatic stress syndrome. R. 19. He further determined that

Plaintiff has the residual functional capacity to do a full range of light work, but with mild limitations of activities of daily living, mild limitations in concentration, persistence, and pace, and moderate difficulties with social functioning.  R. 20.   The ALJ determined at step 4 that Plaintiff could still do his past relevant work as a systems designer and thus was not disabled.  R. 23.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).   "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).   "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).   "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).   The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).   "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1.   Is the individual currently engaged in substantial gainful activity?

2.   Does the individual have any severe impairments?

3.   Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.   Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy. Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Medical and other evidence in the record**[1]

Plaintiff enlisted in the Army and served from January, 1966, through January, 1968. R. 141. He first served in Germany and then went Vietnam for a year. R. 142. He was sent all over Vietnam and into Cambodia; he was in very heavy combat starting on his fourth day in Vietnam, in April, 1967. R. 142, 147. He was a Platoon Leader in a

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS (MERRIAM-WEBSTER), found at: www.nlm.nih.gov/medlineplus/mplusdictionary.htm. Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html. The pages at these websites are not attached to this report and recommendation because the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

mortar platoon. *Id.* "Part of the time he was a 'tunnel rat.' " R. 281. In June, 1967, he

was twice wounded, and received the Purple Heart and the Purple Heart with Oak Leaf

Cluster. R. 152, 153. In 1967, he was awarded the Army Commendation Medal for

Heroism. R. 150-151. The citation for that commendation reports that he was wounded

in the head, was given medical attention, returned to his squad to assist in clearing the

enemy position, and then helped evacuate the wounded. *Id.* He also was awarded the

Bronze Star for meritorious achievement in combat while in Vietnam. R. 154.

An intake information form was completed for Plaintiff on April 2, 2003, at the Vet

Center. R. 141. It was noted that he suffered sleep disturbance. R. 144. It was also

reported that Plaintiff had been a good student in public school, but at the age of 14 he

started drinking alcohol with his father, who was also a combat veteran. R. 145.

Plaintiff said he was a heavy weekend drinker of alcohol. *Id.* Plaintiff volunteered for

military service. *Id.* Plaintiff reported increased alcohol use after he returned from

military service. R. 147. He said that alcohol helped with bad nightmares, war

memories, sleep problems, nervousness, and depression. *Id.* Plaintiff said that he

"stays clear" of things that remind him of Vietnam, and he does not like to be around

people. *Id.*

Plaintiff began counseling with Jimmie L. Thomas, a licensed clinical social

worker, on the same day, April 2, 2003. Plaintiff reported that his alcohol abuse had

resulted in the permanent loss of his driver's license in 1983 and then again, in 1993

after it had been reinstated. R. 401. He said he has abstained from use of alcohol for

at least 12 years. *Id.* and R. 355. He said he resorted to heavy drinking to help him

cope with problems after the war.  R. 400.  He then denied having any problems related to his war experiences at the present.  *Id*.  He said that he has tried to put Vietnam behind him, and he avoids things that remind him of the war.  *Id*.  Thomas thought that Plaintiff tended to minimize his experiences in Vietnam and the relationship of those experiences to his past abuse of alcohol and substances.  R. 398.  He was to return the next week.  *Id*.

On April 9, 2003, Thomas noted that Plaintiff displayed evidence of social isolation, avoidance of reminders of the war, and mild anxiety.  R. 398.  He was to return the next week.  *Id*.

Plaintiff canceled his appointment on April 14, 2003, because he could not find a friend to drive him to the appointment.  R. 397.  Plaintiff returned to the Vet Center on April 23, 2003.  *Id*.  Plaintiff brought in photographs from Vietnam, related how he had been exposed to large numbers of dead enemy soldiers shortly after he arrived, felt overwhelmed with fear, and tried to adjust and make the best of a bad situation.  *Id*.  Thomas said that Plaintiff displayed mild discomfort talking about his experience in Vietnam, but was otherwise doing "ok."  *Id*.

On April 30, 2003, Thomas said that Plaintiff was coming to understand how his abuse of alcohol had hurt him.  R. 396.  Thomas said that Plaintiff was sober and his psychological symptoms were less bothersome.  *Id*.  He had been able to maintain his sobriety.  *Id*.  On May 7, 2003, Thomas noted that Plaintiff was much better and not in distress.  *Id*.  On May 14, 2003, Plaintiff's mood was upbeat and his affect was "ok."  R. 395.  He reported that all was going well.  *Id*.  On May 21, 2003, Plaintiff said he was

enjoying his retirement, worked several hours during the week to help a friend who owned a store, and had no complaint. *Id.* Thomas noted that Plaintiff's symptoms had decreased. *Id.*

On May 28, 2003, Plaintiff talked about hunting and fishing, and said both were helpful in managing stress. R. 395. He had no complaints or psychological symptoms. *Id.* During the counseling session on June 4, 2003, Thomas addressed the issues of avoidance and isolation. R. 394. He noted that Plaintiff had "one associate," "but mainly keeps to himself." *Id.* Plaintiff had no complaint of PTSD symptoms. *Id.*

On June 11, 2003, Plaintiff told Thomas that it was "too much of a hassle trying to deal [with] people." R. 394. Thomas noted that Plaintiff did not appear to be in distress. *Id.*

On June 18, 2003, Plaintiff told Thomas that he stays busy working on land he owns near Madison, Florida. *Id.* There were no reports of alcohol use or PTSD symptoms. *Id.* Thomas found Plaintiff to be socially isolated and lacking in trust for others. *Id.*

On July 3, 2003, Thomas said he thought that Plaintiff trusted him as a counselor, but was not ready to address new issues. R. 393. On August 11, 2003, Plaintiff said he had decided to attend group counseling. *Id.* He was scheduled for August 14, 2003. *Id.* On August 14, 2003, Plaintiff attended group counseling for the first time. R. 393. Thomas said that Plaintiff opened up, interacted with the others in the group, and disclosed his history of alcohol abuse and attempts to cope after returning from Vietnam. R. 392. On September 11, 2003, Thomas said that Plaintiff

was making gains in group counseling. *Id*. On September 25, 2003, Plaintiff reported to the group that all was going well for him. *Id*. However, Thomas noted that Plaintiff became silent when the group discussion shifted to Vietnam, and he continued his pattern of avoidance. *Id*.

On February 5, 2004, Plaintiff returned to group therapy. R. 391. Plaintiff described the fear he felt in his first firefight in Vietnam, and he repeated that he abused alcohol to cope with the distress. *Id*. Thomas noted that Plaintiff had chronic PTSD, and his symptoms could increase in intensity with stress. *Id*. Plaintiff attended group counseling again on February 19, 2004. *Id*. Thomas noted that Plaintiff's self-disclosure had increased. R. 390. He returned again on March 18, 2004, and his mood was upbeat. *Id*. Thomas reported that Plaintiff was doing well. *Id*.

Plaintiff attended group counseling with Thomas on April 9, 2004, April 29, 2004, May 27, 2004, June 10, 2004, June 24, 2004, July 8, 2004, July 29, 2004, August 19, 2004, November 18, 2004, December 2, 2004, and December 16, 2004. R. 385-389. It was noted at various times that he was making gains, his mood was upbeat, all was going well, and he was doing OK, but it was also noted that Plaintiff was still distressed, easily angered, and was frustrated with the legal system. *Id*. Plaintiff said that during combat, he did not care whether he lived or died, and he was unable to feel anything. R. 385.

On November 14, 2004, the clinical psychologist, Julia A. Adams, contacted Thomas, who reported that Plaintiff had been "struggling since he got out of the military." R. 280. His military history was related, including a note that he had had

"much combat exposure." *Id.* It was observed that "he isolates on his property, spends his time fishing and hunting," had been arrested five times for DUI, but had not had alcohol for four or five years. *Id.* While it was thought that Plaintiff was "somewhat rigid," he had a good relationship with Thomas, did well in the group, had a good sense of humor, contributed a lot, but still had a lot of anger. *Id.* Thomas told Davis that Plaintiff "does have PTSD symptoms about which he has been in heavy avoidance for years," and it was still difficult for Plaintiff to talk about it. *Id.*

On November 16, 2004, Thomas referred Plaintiff to the VA medical center for a psychiatric evaluation. R. 279. The intake assessment was rescheduled for December 30, 2004. R. 279-280.

The psychiatric evaluation by Dr. Adams occurred on January 3, 2005, a few days after the expiration of his insured status. R. 280. In that evaluation it was reported that Plaintiff had a 40% VA disability rating for diabetes mellitus, benign skin neoplasm, and tinnitus. *Id.* Plaintiff said that he had trouble sleeping, and that he awakes to minor noises. *Id.* He said that when he hears a sound at night, he jumps up, grabs his gun, and checks his yard. *Id.* He said that he sometimes has combat nightmares. *Id.* He is tired during the day. *Id.* He said he did not know how to socialize anymore. *Id.* He said he is often irritable, which turns into anger. *Id.* He said he had had more intrusive thoughts about combat in the prior two years since he started going to the Vet Center to talk about his combat experiences. R. 280-281.

Plaintiff said that was living alone on 190 acres in a home he built before he retired. R. 281. He said he had retired at age 52 from his public works design job

because he lost interest in what he was doing, was not getting any appreciation, and his supervisors "just push[ed] more" work on him.  R. 282.  He said he felt safer with a gun in his hand, and had guns in his house, under his bed.  *Id.*  Apparently he reported that he was still drinking and still driving, though he said he never combines the two activities.  *Id.*  He said that he was still drinking up to 16 beers a day.  *Id.*  He did not see his use of alcohol as a problem.  *Id.*

On examination, Dr. Adams found that Plaintiff was alert, cooperative, had unremarkable behavior, with no indication of psychosis, dementia, or danger to himself or others.  R. 283.  Her diagnosis was PTSD, depressive disorder NOS.  *Id.*  She assigned a GAF score of 65.[2]

Meanwhile, Plaintiff continued to regularly attend group counseling from January, 2005, through July 18, 2007.  R. 376-384.  Thomas continued to report throughout 2005 that Plaintiff was making gains, his anger was decreasing, his mood was upbeat, and he was doing OK.  R. 380-384,

Plaintiff was seen by Marie E. Go, M.D., a psychiatrist, on February 15, 2005.  R. 276.  Much of the same personal history was recorded by Dr. Go, apparently taken from Dr. Adams's report.  R. 276-277.  Plaintiff had not taken any psychotropic medications.

---

[2] GAF is Global Assessment of Functioning.  A GAF score of 61-70 indicates:

Some mild symptoms ( e.g., depressed mood and mild insomnia ) OR some difficulty in social occupational, or school functioning (e.g., occasional truancy or theft within the household ), but generally functioning pretty well, has some meaningful interpersonal relationships.

*See*  http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp explaining Axis V of the DSM-IV Multiaxial System and the meaning of the GAF scores.

R. 277.  Dr. Go found that Plaintiff's mood was depressed.  *Id.*  Her diagnosis was post

traumatic stress disorder, chronic, depressive disorder NOS, alcohol abuse, and

cannabis abuse.  R. 278.  She assigned a GAF score of 60.[3]  *Id.*

On March 31, 2005, Plaintiff saw Dr. Go again.  R. 264-268.  Plaintiff was taking

Wellbutrin[4] without adverse effects, but did not feel a whole lot of improvement.  R. 265.

BuSpar[5] was added.  R. 266.  He reported that he had been motivated to do yard work

for about a week, but was back "to his old self of amotivation and anergia."  R. 265.  He

reported a recent dream of a day in heavy combat in Vietnam.  *Id.*  He remained

isolated.  *Id.*  He admitted having 6 beers since the last visit, but denied drinking 10+

beers daily.  *Id.*  Chronic PTSD and depressive disorder were diagnoses and a GAF

score of 55 was assigned.  *Id.*

On May 17, 2005, Plaintiff against saw Dr. Go.  R. 258.  He was still lacking in

motivation and "easily flies off the handle."  *Id.*  He said he was not using alcohol, but

still used marijuana.  R. 258-259.  His affect was brighter.  R. 259.  The same diagnoses

were entered and a GAF of 55 was assigned.  R. 259.

On July 11, 2005, Thomas wrote a letter to the service officer at the Florida

Department of Veterans Affairs describing Plaintiff's condition and course of treatment.

---

[3] A GAF score of 51-60 indicates: "Moderate symptoms ( e.g., flat affect and circumstantial speech, occasional panic attacks ) OR moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or co-workers).  *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

[4] Wellbutrin is indicated for treatment of depression.  PHYSICIANS' DESK REFERENCE (2005).

[5] BuSpar is hydrochloride of buspirone, a mild antianxiety tranquilizer.  MEDLINE PLUS.

R. 354. Thomas related Plaintiff's combat experience and his symptoms of PTSD. R. 354-355. He described Plaintiff's avoidance of stress and memory triggers, restricted range of emotions, lack of trust of people, lack of interest in activities, chronic sleep disorder, exaggerated startle response to sudden loud noises, hyper vigilance and anxiety. R. 355. He noted that Plaintiff was socially isolated and lived alone. *Id.* Thomas said that despite the "enormous difficulty he has with trust," he regularly attended the Vet Center readjustment group and got along well with other veterans. *Id.* Thomas said that Plaintiff:

> suffers from chronic and severe PTSD and related depression resulting from combat-related traumas he experienced in Vietnam. His ability to function socially and occupationally is severely impaired by the above psychological disorders. Although he has a poor prognosis, it is believed he will continue to benefit from the current regiment of counseling and prescribed medications. This combination will help reduce his symptoms but not to the point of restoring him to a level that will enable him to function adequately in social and occupational settings.

R. 355-356.

On August 23, 2005, Plaintiff returned to Dr. Go. R. 257. He had a new girlfriend, but he did not know how long the relationship would last because he very easily became angry. *Id.* He reported that since his last visit, he had had 6 to 8 beers at a wake. *Id.* He still smoked marijuana to calm himself. *Id.* A GAF score of 55 was assigned. R. 258. Celexa[6] was added to his medications. *Id.*

On September 12, 2005, Plaintiff was evaluated by Roger Davis, Ph.D., and the Veterans Hospital. R. 216. The same personal history was reviewed. *Id.* Plaintiff

---

[6] Celexa is used to treat major depression. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

reported that his medications had been somewhat helpful and group therapy was helpful. *Id.* He said he last drank alcohol several months earlier at the wake. R. 217. Plaintiff reported that he had a lot of conflict with his supervisors when he worked as a public works engineer. *Id.* He said he lost earlier jobs due to drinking. *Id.* Plaintiff said he had four close friends, and he enjoyed hunting and fishing. *Id.*

Dr. Davis thought that Plaintiff had the capacity to complete activities of daily living. *Id.* His findings on examination were, for the most part, normal. *Id.* Plaintiff again said he slept only about four hours a night and was awakened by noise and had to check to see if he was safe. *Id.* He said he had been anxious, but did not relate how frequently. *Id.* He denied that he experienced panic, obsessions, or compulsions. *Id.* He had had two nightmares about Vietnam in the prior week. R. 218. Plaintiff said he felt detached about 30-40% of the time, and experiences a sense of a foreshortened future much of the time. *Id.* "He stated that he is always hypervigilant, even at home and has many guns hidden in different areas of his home for protection." *Id.* Plaintiff said that his PTSD symptoms were in remission when he went on drinking binges, and were not as severe as they once were "in part because the group therapy helps." *Id.* He denied experiencing any traumatic events since the war. *Id.* Dr. Davis assigned a GAF score of 55. *Id.* Dr. Davis determined that Plaintiff's condition meet the criteria for post traumatic stress disorder associated with traumatic events in Vietnam. *Id.* Dr. Davis said:

> The [PTSD] symptoms appear to have a moderate impact upon the veteran's level of functioning. His chronic platonic detachment and irritability have caused problems with dating. The veteran is, currently

retired.  While he was able to hold a job for over 20 years, he reported that
his irritability caused intermittent conflict with supervisors.

R. 218.

On December 1, 2005, Plaintiff returned to Dr. Go.  R. 254.  He still carried a

40% disability rating from the VA for diabetes, impaired hearing, and skin neoplasm,

with no mention of PTSD.  *Id*.  Plaintiff reported that he had had improvement of mood

and temper with the addition of Celexa to his medications.  *Id*.  He still had recurring

nightmares, flashbacks, and intrusive thoughts about Vietnam.  *Id*.  He had been deer

hunting recently, had killed nine deer and two pigs, and some friends were coming to

hunt with him.  *Id*.  Plaintiff recalled the tunnels he went through in Vietnam, and said his

drug of choice was marijuana.  *Id*.  He continued to sporadically drink alcohol.  *Id*.

Plaintiff told Dr. Go that during the past month, he had not been bothered by "feeling

down, depressed, or hopeless," and had not been bothered by "little interest or pleasure

in doing things."  *Id*.  Dr. Go assigned a GAF score of 55 that day.  R. 255.

Plaintiff continued to regularly attend group counseling in 2006.  R.  380.  He was

distrustful and socially isolated on May 4, 2007, but he was doing OK on August 3,

2006, and his mood was euthymic[7] on September 17, 2006.  R. 378-379.

Plaintiff saw Dr. Go again on July 17, 2006.  R. 242.  At this point, Dr. Go noted

that Plaintiff had a 70% VA disability rating, with 50% attributed to PTSD.  *Id*.  Plaintiff

reported he had nightmares one or two times a week.  *Id*.  He was still attending group

therapy with Jimmy Thomas at the Vet Center.  *Id*.  He said that he used marijuana

---

[7] "Euthymic is a medical term referring to a joyful or tranquil mood, neither manic nor
depressed."  Sultan v. Barnhart, 368 F.3d 857, 861 n. 2 (8th Cir. 2004).

daily, and smoked two packs of cigarettes a day. *Id.* His intake of alcohol remained sporadic. *Id.* Dr. Go thought that Plaintiff was alert, oriented, his mood was euthymic, his affect was congruent, his thought processes were organized, and his judgment and insight were intact. *Id.* A GAF score of 55 was assigned. *Id.*

On August 31, 2006, Billie M. Warren, Ph.D., conducted a "compensation and pension examination" at the VA to evaluate Plaintiff's PTSD. R. 200. Plaintiff said he could control his temper better with therapy. R. 201. He was using marijuana daily or four times a week. R. 202. Plaintiff's mood was depressed, but he was cooperative and friendly. *Id.* Results of testing were basically normal. R. 202-203. Plaintiff's recent memory was found to be mildly impaired. R. 204. Plaintiff said he elected to retire early. R. 205. Dr. Warren concluded that Plaintiff met the DSM-IV criteria for a diagnosis of PTSD, cannabis abuse, and depressive disorder. R. 206. It was noted that use of marijuana can contribute to low motivation and short-term memory complaints. *Id.* Dr. Warren assigned a current GAF score of 57 with respect to PTSD. *Id.* The prognosis was fair. R. 207. Dr. Warren said that he thought that Plaintiff's PTSD did not cause a total occupation and social impairment, and did not result in deficiencies in judgment, thinking, family relations, work, mood, or school. *Id.* Dr. Warren did think that Plaintiff's PTSD would reduce his reliability and productivity as a result of fatigue, irritability, and his tendency to emotional detachment. *Id.*

On December 1, 2006, Plaintiff saw Dr. Go. R. 367. Plaintiff reported the continuation of the same symptoms of PTSD. *Id.* He said he could not sleep at night, and he slept all day. *Id.* His temper was still bad and he had low tolerance for

frustration. *Id.* He continued to smoke cigarettes and marijuana. *Id.* Again, Dr. Go found Plaintiff's mood to be euthymic, and his judgment and insight intact. R. 368. She assigned a GAF score of 55 and counseled against use of tobacco and marijuana. *Id.*

On December 1, 2006, Plaintiff also saw Dr. Adams, the psychologist. R. 368-371. He told Dr. Adams that in the past two years, he had had no arrests, but on one occasion had pulled a gun on a man who had cut ahead of him in a line at a convenience store because he thought the man was pulling a knife on him. R. 370. He said he drinks after he hunts, and uses marijuana regularly. *Id.* Dr. Davis said that Plaintiff reported that he had been feeling "low the last 6 months," but otherwise his mental status was normal. *Id.* Dr. Davis assigned a GAF score of 55. *Id.* Plaintiff told Dr. Davis that he had little interest in things nearly every day, and was feeling depressed and hopeless about one half of the days. R. 371.

On March 1, 2007, Plaintiff saw Dr. Go. R. 357. He said that not a day goes by that he does not think about Vietnam, and he reported that he was a little worse in his experience of nightmares, intrusive thoughts, and flashbacks. *Id.* He remained hyper vigilant. *Id.* A sleep study was scheduled. *Id.* Plaintiff said he self-medicated with marijuana, and could not give it up yet. *Id.* Dr. Go found that Plaintiff's mood was dysphoric, his affect was blunted, but his judgment and insight were intact. *Id.*

Plaintiff attended group counseling regularly in February, March, and April, 2007, when the records end. R. 376. He reported he was doing OK on February 15, 2007, had no distress to report on March 29, 2007, and April 12, 2007, and the counselor noted that he had moderate PTSD on March 29, 2007. *Id.*

On June 11, 2007, Dr. Go filled out a mental residual functional capacity questionnaire for Plaintiff.  R. 349.  "Marked" was defined as seriously affecting one's ability to function in a work setting.  *Id.*  Dr. Go said that Plaintiff is markedly limited in his ability to accept instruction from or respond appropriately to criticism from supervisors or superiors, to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes, to respond appropriately to co-workers or peers, and to relate to the general public and maintain socially appropriate behavior.  *Id.*  She said her opinion would not change if Plaintiff did work requiring that he have only minimal contact or interaction with others.  R. 350.  Dr. Go felt that Plaintiff is markedly limited in almost all aspects of ability to sustain concentration and persist.  *Id.*  She said he was markedly limited in his ability to perform and complete work tasks, to work in cooperation with others without being distracted by them, to carry through with instructions and complete tasks independently, to maintain attention and concentration for more than brief periods of time, and to perform at production levels expected by most employers.  *Id.*  She also thought that Plaintiff is markedly impaired in his ability to respond appropriately to changes in a work setting, to remember locations and workday procedures, to behave predictably, reliably, and in an emotionally stable manner, and to tolerate customary work pressures.  R. 350-351.  She thought that Plaintiff's abilities would become worse if he were placed under stress.  R. 351.  She explained that Plaintiff has PTSD, has poor impulse control, has limited tolerance for frustration and stress, has poor concentration and ability to adapt to idiosyncracies of other people, has anger problems, and is easily get provoked by crowds or social

situations. *Id.* She said that the period of limitations was from February 15, 2005, and was indefinite. R. 352. Plaintiff's lawyer then asked Dr. Go to comment upon whether Plaintiff's condition had been as severe before December 31, 2004, his last insured date for disability benefits, and she said that "from history, he had symptoms of PTSD years before I saw him" on February 15, 2005. R. 353.

**Evidence from the administrative hearing**

Plaintiff did not testify at his administrative hearing on the advice of his lawyer. R. 427-438.[8] His lawyer told him that whatever he said about how he was doing on November 6, 2007, the date of the hearing, would have no bearing on how he was doing on December 31, 2004. R. 438.

The Administrative Law Judge called Neil Lewis, Ph.D., as an expert to testify from his review of the records. R. 427. Dr. Lewis did not examine Plaintiff.

Dr. Lewis said that in 2004 and earlier, Plaintiff had only mild to moderate levels of mental impairment, based upon his review of the record, and he thought that drug and alcohol use "would be material in this case." R. 428. He said that limitations of Plaintiff's activities of daily living were probably mild, and limitations in social functioning were probably moderate. R. 436. Dr. Lewis was then referring to the "B" criteria of the Listing. R. 428, 436. Dr. Lewis said that even in 2005, Plaintiff was assigned GAF scores of 57, 60, and 65, "when generally indicates that he's doing fairly well." *Id.* He said that the rating of a marked impairment by Dr. Go, Plaintiff's treating physician

---

[8] Page 439 of the record, the last page, is not in this record. It does not appear to contain anything of relevance, however, as the hearing was ending on page 438 with the decision that Plaintiff would not testify.

(exhibit 9F, R. 349-353), was "inconsistent with the record as a whole, and unsupported generally by her own treatment notes." R. 428-429. He noted that in May, 2006, there was a progress note that Plaintiff said he was doing well and was free of post traumatic stress disorder symptoms. R. 429 (citing exhibit 12F, p.4, R. 379). Dr. Lewis did not disagree that Plaintiff suffers from post traumatic stress disorder. R. 431. He disagreed, however, that Plaintiff's use of alcohol or marijuana are symptoms of PTSD. *Id.* Dr. Lewis said that he based his opinion not just upon the GAF scores, but also upon the treatment notes of Dr. Go. R. 433. He said that "the contemporaneous notes that [Mr. Thomas] made of [Plaintiff's] attendance at the group sessions don't really support that level of severity." R. 434. Dr. Lewis speculated that the inconsistency between the treatment notes and the residual functional capacity opinions was a result of the desire of the treating sources to help Plaintiff get an award of social security disability benefits. R. 435.

**Legal analysis**

**Whether the ALJ erred by failing to consult a vocational expert**

Plaintiff points out that the ALJ found that Plaintiff has "mild limitations in activities of daily living, moderate difficulties in social functioning, [and] mild limitations in concentration, persistence and pace." Doc. 19, p. 19, citing R. 20. Most notable of these for an ability to do work are the moderate difficulties in social functioning. Plaintiff asserts that the ALJ "failed to explain how skilled work as a system [designer] [Plaintiff's past relevant work] could be performed with the additional mental limitations noted by the ALJ." *Id.*, p. 20. Plaintiff argues that since the ALJ found that Plaintiff had a "severe" mental impairment at step 2, that impairment must significantly limit his abilities to perform his past relevant work. *Id.* Plaintiff also argues that the ALJ failed to follow SSR 82-62 with respect to findings about the requirements of past relevant work. *Id.* Plaintiff relies upon Allen v. Sullivan, 880 F.2d 1200, 1202 (11th Cir. 1989) for the proposition that a vocational expert must be called to establish whether the claimant can perform "work that exists in the national economy" if a claimant has work limitations. *Id.*, p. 19.

The issue of whether a claimant can perform work that exists in the national economy is a step 5 question. Allen is a step 5 case that concerned whether the Commissioner could rely upon the "grids"[9] instead of vocational testimony to carry her

_____

[9] Appendix 2 to Subpart P of Part 404 – Medical-Vocational Guidelines, found at: http://www.ssa.gov/OP_Home/cfr20/404/404-ap11.htm

burden at step 5.[10]  Whether or not Plaintiff can do his past relevant work as a systems

designer is a step 4 question, and there, the burden of proof is upon Plaintiff:

> *It is also well settled that the claimant bears the initial burden of establishing a severe impairment that keeps him from performing his past work.*  If the claimant establishes that he suffers from such an impairment, the burden shifts to the Secretary to establish that the claimant is able to perform other work.

Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986) (emphasis added).  Therefore,

generally speaking, vocational evidence was not needed until Plaintiff had shown that

he could not do his past relevant work.

However, Social Security Ruling 82-68 provides in part:

> The decision as to whether the claimant retains the functional capacity to perform *past work* which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision.  Since this is an important and, in some instances, a controlling issue, e*very effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.*

> Sufficient documentation will be obtained to support the decision.  *Any case requiring consideration of PRW will contain enough information on past work to permit a decision as to the individual's ability to return to such past work (or to do other work).*

> *Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations.*  Detailed information about strength, endurance, manipulative ability, *mental demands* and other job requirements must be obtained as appropriate.  This information will be derived form a detailed description of the work *obtained from the claimant, employer, or other informed source.*  Information concerning job titles, dates work was performed, rate of compensation, tools and machines used, knowledge required, the extent of supervision and independent judgment required, and a description of tasks and responsibilities will permit a judgment as to the skill level and the current relevance of the individual's work experience.  *In addition, for a*

---

[10] The burden of coming forward with evidence at step 5 is upon the Commissioner. Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985).

*claim involving a mental / emotional impairment, care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work. . . .*

SSR 82-68 (emphasis added). In other words, while the burden of proof at step 4 is upon Plaintiff, the ALJ has a duty to prepare a complete record if the evidence suggests that the record is not sufficiently complete to make a decision.[11]

That is the case here. The evidence as to the mental requirements of Plaintiff's past relevant work is uncertain. Plaintiff reported that he did the job for 22 years, R. 85, and several times referred to his cessation of employment as a retirement. He said that he was not required to supervise other people. *Id.* He said that he used tools and may have written reports, although the evidence as to reports is in conflict. *Id.* He also reported, however, that as the years went by, he spoke out, had difficulties with supervisors, and became more distrustful of authority. R. 110-111. On September 12, 2005, Plaintiff told to Dr. Davis that he had a lot of conflict with his supervisors when he worked as a public works engineer. R. 217.

This is enough evidence to give rise to a duty to inquire further, most probably from Plaintiff himself, but perhaps from Plaintiff's former employer as to the mental

---

[11] "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ." Sims v. Apfel, 530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000), citing Richardson v. Perales, 402 U.S. 389, 400-401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). This basic duty exists whether or not the claimant is represented. Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995) (citation omitted). Additional evidence, however, is not necessary if the record contains sufficient evidence to make a decision. Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999).

requirements (social functioning) of Plaintiff's former job. The extent to which Plaintiff had to get along with others in that work is not known, on this record, and whether he could perform that work with moderate limitations as to social functioning cannot be clearly determined without such specific information. Perhaps a vocational expert could help, but the evidence needed is about the specific job, not jobs of that sort in general. A remand is recommended for that purpose.

### Whether the ALJ's mental residual functional capacity finding was incomplete and not supported by substantial evidence

Plaintiff contends that the ALJ's mental residual functional capacity determination was incomplete. Doc. 19, p. 21. Plaintiff argues that at step 3, the ALJ only considered the "B" and "C" criteria for the Listing, and did not do the more detailed analysis for residual functional capacity at steps 4 and 5. Plaintiff cites Social Security Ruling 96-8p, which provides in part:

> The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. *The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.*

SSR 96-8p (emphasis added). Listing 12.00 (Mental Disorders) provides in part:

> RFC is a multidimensional description of the work-related abilities you retain in spite of your medical impairments. *An assessment of your RFC*

> *complements the functional evaluation necessary for paragraphs B and C*
> *of the listings by requiring consideration of an expanded list of*
> *work-related capacities that may be affected by mental disorders when*
> *your impairment(s) is severe but neither meets nor is equivalent in severity*
> *to a listed mental disorder.*

Listing 12.00A (emphasis added).

Plaintiff points out that Dr. Lewis testified only as to the "B" criteria of the Listing.

*Id.*, p. 21, citing R. 436. The "B" criteria of the Mental Listings are:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

*E.g,* Listing 12.06B (Anxiety Related Disorders). This is true. Dr. Lewis's opinion that

Plaintiff had moderate limitations in social functioning was an opinion only with

reference to the "B" criteria of the Listing. R. 428, 436.

As pointed out by Plaintiff, the State Agency reviewer properly considered the

more complex assessment. That reviewer determined from the record that Plaintiff is

moderately limited in ability to maintain attention and concentration for extended

periods, to work in coordination with or in proximity to others without being distracted by

them, to complete a normal workday without interruptions from psychologically based

symptoms and without an unreasonable number of rest periods, and to maintain socially

appropriate behavior. R. 163-164 (Exhibit 5F). The reviewer concluded:

> While the claimant may have experienced some difficulty with sustained
> concentration and persistence at times and he may have been easily
> distracted by others at times, his cognitive functioning appeared to be
> intact. A history of poor social judgment was evident, but, overall, the

> claimant appeared capable of adequate social functioning, adaptation, *and of routine, repetitive tasks* performed on a sustained basis as so motived prior to the DLI [date last insured].

R. 165 (emphasis added). Plaintiff argues that a limitation to "routine, repetitive tasks" would preclude work as a public works systems designer.

The ALJ did not mention the State Agency reviewer's opinion as contained in Exhibit 5F, R. 163-166. The ALJ cited only Exhibit 6F. R. 23. Exhibit 6F was the psychiatric review technique that determined whether Plaintiff's condition met or equaled a Listed impairment. R. 167-180 (especially R. 179, finding the Listing was not met). This review, like the opinion of Dr. Lewis, covered only the "B" functional limitations of the Listing. R. 177. A remand is needed, therefore, to consider Exhibit 5F, to assign the appropriate weight to it, and then, if it is concluded based upon that Exhibit that Plaintiff is limited to routine, repetitive tasks, to determine whether he could still do his past relevant work with that limitation.

### Whether the ALJ improperly rejected the opinion of a treating physician, Dr. Go, in favor of an opinion of a non-examining psychologist, in determining Plaintiff's mental residual functional capacity

This argument is a subsidiary argument to claim two, discussed above. The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2). Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues. 20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004). "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986). "Where the Secretary has ignored *or* failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." *Id.* (emphasis added); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991); Critchfield v. Astrue, 2009 WL 635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD). *Compare*, Harris v. Astrue, 546 F.Supp.2d 1267 (N.D. Fla. 2008) (No. 5:07cv44-RS/EMT) (remanding because the ALJ gave improper reasons to discount the opinion of a treating physician, but did not ignore it).[12] *But see,* Cole v. Barnhart, 436 F.Supp.2d 1239 (N.D. Ala. 2006) (finding

---

[12] Harris distinguished MacGregor as a case where the ALJ made no finding as to the weight of the opinion of the ALJ, *i.e.*, he *ignored* the opinion. 786 F.Supp.2d at 1282.

that the opinions of the treating physician must be accepted as true where the ALJ "did not properly refute them.").

This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory."). *See also*, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

The ALJ gave two reasons to disregard Dr. Go's opinion. First, the ALJ wrote:

> The claimant's treating psychiatrist, Dr. Go, opined that the claimant's history indicated that his symptoms had predated his date last insured. However, in her mental residual functioning questionnaire, she noted that his limitations had begun on February 15, 2005, after his date last insured. Dr. Go's opinion is considered but is given little weight during the period prior to his date last insured, December 31, 2004.

R. 23.

All of this is true, but is not substantial evidence in the record to discount the opinion of Dr. Go. Dr. Go did not begin treating Plaintiff until shortly after his insured status had expired, but a record of treatment by social worker Thomas at the Vet Center are available in this record from 2003. It is reasonable to assume that Dr. Go, a Veterans' Administration psychiatrist, has had a considerable amount of experience in treating combat veterans suffering anxiety related disorders. There is no dispute that

Plaintiff's troubles were caused 40 years ago, in combat in Viet Nam. Post traumatic stress disorder begins with the trauma, and usually is long standing. *See, e.g.*, Allord v. Barnhart, 455 F.3d 818, 820 (7th Cir. 2006). To say that Dr. Go could not express an opinion that Plaintiff's condition was exactly the same on December 31, 2004, and in the months prior to that, as she found in early 2005 when she first started treating Plaintiff, is not persuasive.[13] "A physician's retrospective diagnosis is a medical opinion of the claimant's impairments which relates back to the covered period." Estok v. Apfel, 152 F.3d 636, 639 (7th Cir. 1998) (citations omitted). "A retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period." *Id.*, at 640 (citations omitted). This is simply another way of saying that the opinion of a treating physician need not be given considerable weight if the opinion is inconsistent with or not supported by contemporaneous medical records. The issue is whether the medical records were contrary to Dr. Go's opinion, and as to that, the ALJ provided no independent discussion. He deferred, instead, to Dr. Lewis.

The second apparent reason for rejecting Dr. Go's opinion was that the ALJ found that Dr. Lewis's opinion should be given substantial weight "as it is consistent with

---

[13] Defendant argues that Dr. Go was not Plaintiff's treating physician until February, 2005, and therefore "was not Plaintiff's treating psychiatrist during the period relevant to his application for disability insurance benefits." Doc. 24, p. 6. Dr. Go treated Plaintiff from February, 2005, until June 11, 2007, when she expressed her opinion. R. 349. Plainly she was a treating physician who had seen Plaintiff's condition over more than two years before she expressed her opinion. The issue is not whether she was a treating physician, but whether Plaintiff's condition is one which Dr. Go could not reliably assess retrospectively. A combat veteran who has struggled with PTSD for 40 years is precisely the kind of patient for which a treating physician might reliably express a retrospective opinion. Besides, this record contains treatment records that go back to 2003.

the evidence." As with Dr. Go's opinion, the ALJ did not identify the evidence was consistent with Dr. Lewis's opinion.

The opinion of a non-examining physician like Dr. Lewis is "entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision." Swindle v. Sullivan, 914 F.2d 222, 226 n.3 (11th Cir.1990), *citing*, Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir.1985). Nonetheless, assessments by non-examining physicians may be considered by the ALJ as expert opinions. 20 C.F.R. § 416.927(f)(2)(i). Dr. Lewis served the same purpose as a State Agency reviewer, and his opinion should have about the same weight.

The problem with Dr. Lewis's assessment is that he did not treat Plaintiff over a long period of time, as did Dr. Go. He did not treat Plaintiff at all. He relied completely upon the absence of notations of major mental problems manifested during encounters with Dr. Go or during group counseling. He speculated that Dr. Go was slanting her opinion to provide an award of benefits to Plaintiff. That might be true, but there was another reasonable basis for Dr. Go's opinion. Plaintiff was usually assigned GAF scores between 55 and 57, with one score at 65, and was often said to be doing well, with an upbeat mood. GAF scores are important, and these scores show only moderate limitations, but it is unknown whether the GAF scores were assigned to describe Plaintiff's status at the time of the treatment encounter, or were assigned to express an opinion as to the degree Plaintiff could withstand the stress of a normal workplace. It is entirely possible that the GAF scores only reflected how Plaintiff was doing with support

from his group therapy and living alone on his property, without any stress from social

interaction or the demand to be productive in a job.

Where there is an ambiguity in the treating physician's records or opinion, the

Administrative Law Judge should take steps to clarify it:

> Additionally, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000). The Commissioner's regulations

provide that if "the evidence we receive from your treating physician . . . is inadequate

for us to determine whether you are disabled,"

> [w]e will first recontact your treating physician . . . to determine whether the additional information we need is readily available. *We will seek additional evidence or clarification from your medical source when the report from our medical source contains a conflict or ambiguity that must be resolved , the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.* We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

20 C.F.R. § 404.1512(e)(1) (emphasis added). *See also*, Rosa v. Callahan, 168 F.3d

72, 79 (2d Cir. 1999) ("One of our recent opinions confirms, moreover, that an ALJ

cannot reject a treating physician's diagnosis without first attempting to fill any clear

gaps in the administrative record) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir.

1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.")).

Therefore, a remand is needed to obtain further evidence from Dr. Go to explain her opinion in light of the record evidence and GAF scores. Further, since it is still unknown whether Plaintiff is capable of returning to his past relevant work, it is possible that this case will be resolved at step 5. If that is the case, greater precision is needed from Dr. Go since the degree and kind of limitations that Plaintiff has must be determined so that a vocational expert can attempt to identify jobs in the national economy which Plaintiff might still be able to do.

### Whether the ALJ erroneously failed to comply with SSR 06-3p

Plaintiff argues that the ALJ erred by failing to address and evaluate his VA disability rating for PTSD as required by SSR 06-3p. Doc. 19, p. 24. That Ruling notes that pursuant to 20 C.F.R. §§ 404.1504 and 416.904, a decision by another governmental agency as to disability "is not our decision about whether your are disabled . . ." since that decision is reserved to the Commissioner. This is so because other agencies may have different rules and standards. *Id.* The Ruling concludes, however, that "the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases." *Id.*

The ALJ did not mention the notations in the medical records beginning on July 17, 2006, that the VA had determined that Plaintiff was 70% disabled, with 50%

attributed to PTSD.  R. 242.  That rating did not appear prior to this date, so the rating must have been assigned in the few months before this date.

Defendant argues that this rating has no relevance because it did not address disability prior to the last insured date, December 31, 2004.  Doc. 24, p. 10.  This is not persuasive for the reasons already discussed.  Though VA disability "requires less proof of disability" than Social Security disability, it should be given some weight.  Allord, *supra*, 455 F.3d at 820.  In Allord, the court reasoned that a VA PTSD disability rating four years after the expiration of insured status should be given some weight because there was evidence that the claimant's "PTSD was of long standing."  The same is true in this case.  There is evidence from treating sources that Plaintiff's PTSD has been of long standing.  A remand is needed to obtain more information about this VA disability rating and to evaluate the relevance of it.

Plaintiff also argues that the ALJ erred in failing to discuss the importance of the residual functional capacity opinion of licensed clinical social worker Thomas, an opinion which was consistent with Dr. Go's opinion.  Plaintiff contends that the ALJ failed to follow the procedures provided by SSR 06-3p and 20 C.F.R. § 404.1513(d).

Social Security Ruling 06-3p provides in part that opinions from "non-medical sources," which includes a licensed social worker, "should be evaluated by using the applicable factors listed above" for opinion evidence from "acceptable medical sources." The ALJ must consider "the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of speciality or expertise, the degree to which the source presents relevant evidence to support his or

her opinion, and whether the opinion is consistent with other evidence . . . ."  The Ruling

also provides that:

> the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case . . . .

Plaintiff had a significant treatment history with Thomas, and Thomas recorded that

treatment history in some detail, as described above.  He expressed significant doubts

as to Plaintiff's ability to withstand the stresses of a normal job.  A remand is required so

that the ALJ may consider and discuss Thomas's opinion and comply with this Social

Security Ruling.

### Whether the ALJ erroneously found Plaintiff to be no credible

The ALJ found Plaintiff's written descriptions of the extent of his impairment not

to be credible.  Even though Plaintiff did not testify, there is nothing wrong with making

this determination from the written record.  The "credibility" determination depends upon

analysis of the medical evidence more than it does face to face observation of the

claimant.  But the ALJ's determination of the matters which must be remanded and the

ALJ's determination of these issues, on reconsideration, could have a significant impact

upon this "credibility" finding.  For this reason, this issue should also be remanded for

further consideration.

### Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge

were not based upon substantial evidence in the record and did not correctly follow the

law.  The decision of the Commissioner to deny Plaintiff's application for benefits should

be reversed and remanded.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to

deny Plaintiff's application for Social Security benefits be **REVERSED** and the case

**REMANDED** for further consideration as set forth in this report and recommendation.

**IN CHAMBERS** at Tallahassee, Florida, on February 22, 2010.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**